IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| SHIRLEY R.,<br>    Plaintiff,<br><br>v.<br><br>COMISSIONER OF SOCIAL SECURITY,<br>    Defendant. | Case No. 1:18-cv-01050-JES-JEH |

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 10) and the Defendant's Motion for Summary Affirmance (Doc. 14). This matter has been referred for a Report and Recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

**I**

Shirley R. filed her applications for disability insurance benefits (DIB) and supplemental security income (SSI) on September 5, 2014. She alleged disability beginning on May 31, 2014. Her claims were denied on February 20, 2015 and were denied upon reconsideration on August 12, 2015. Shirley filed a request for hearing concerning her applications on September 19, 2015. A hearing was held before the Honorable Robert V. Luetkenhaus (ALJ) on April 6, 2017. At that hearing, Shirley was represented by an attorney and Vocational Expert (VE)

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 5) on the docket.

George Paprocki testified. Following the hearing, Shirley's claims were denied on May 8, 2017. Her request for review by the Appeals Council was denied on November 29, 2017, making the ALJ's Decision the final decision of the Commissioner. Shirley filed the instant civil action seeking review of the ALJ's Decision on February 2, 2018.

## II

Shirley was 35 years old on the alleged disability onset date. On May 31, 2014, her alleged disability onset date, Shirley was riding a motorcycle as the passenger when a drunk driver hit the motorcycle on which she was riding. She was hospitalized from May 31, 2014 to June 5, 2014 while she received treatment for her injuries. Shirley claimed her ability to work was limited by memory problems, knee pain, back pain, concentration problems, dizziness, anxiety, and post traumatic disorder. AR 313.

At the hearing, Shirley testified that she was 38 years old, 5'9", and 215 pounds. She had one sixteen-year-old son and they lived in a house with a basement and second floor. She had a driver's license and drove every day. She previously obtained her associate's degree and obtained a Certified Nursing Assistant (CAN) certificate. She attended a class about preparing taxes in 2015 but she did not complete it because she "was having problems with sitting . . . because the class was over an hour long . . . and so [she] couldn't sit for that long." AR 49-50. She believed she would not be able to do that work in a job setting if she was unable to even attend the class.

Shirley stated that she did not work anywhere or try to go back to work following the May 31, 2014 motorcycle accident. She testified that the accident "flipped [her] life." AR 58. Since then, she constantly dealt with pain, vertigo, post-traumatic stress disorder (PTSD), pain in her back and chest, and pain in her head. In the accident, Shirley fractured ribs and dislocated her tailbone. As a

2

result of the pain in her back, she could not sit for periods of time beyond an hour. During the time she sat, she moved constantly in an attempt to find a comfortable spot. The injury to her ribs continued to cause her pain when she slept or wore certain types of clothing (bras with wires). The accident caused Shirley a right-sided head injury such that it was tender all the time. She also injured her knee and ankle in the accident and had physical therapy for the knee following the accident. She continued to wear a knee brace at times and had three different braces. While Shirley testified that she fell a few times in the past year because her knee gave out, she continued to go up and down the stairs in her house about 10 times a day at the least. Shirley stated she could walk only a very short distance at one time before she would have to stop and rest.

      Shirley explained she was diagnosed with benign reposition vertigo. She experienced dizziness and nausea as a result. She had vertigo three or four times a week and it settled when she closed her eyes, took deep breaths, and relaxed for five or 10 seconds. She said her PTSD caused panic attacks, anxiety, anger, and nightmares. The medication she took, however, helped Shirley get good rest. She elaborated that "mostly all [of her] medications cause[d] drowsiness or dizziness." AR 74. She was not as social as she was before the accident. She continued to see her parents every day and she went to church every week. Shirley further testified that she and her son split the house chores.

      Upon questioning by her attorney, Shirley testified that she attributed the weight gain, 47 pounds, she experienced since she last worked to her medication. She said her headache pain was "always" at an eight, nine, 10, or above. She had headache pain "[e]very single day." AR 87. She woke up with headache pain and went to sleep with it. She was only on naproxen rather than "norcos" because "they didn't want [her] to get addicted" to the latter. AR 88. Nothing she did made her right-sided headache pain worse, rather, Shirley's headaches worsened

3

on their own. The pain became worse as the day went on. She slept several hours during the day while her son was at school and set her alarm to get up so she could go back to the bus stop to pick him up after school. Shirley said that her doctor adjusted one of her medications to "make [her] be more functional during the day" because the higher dosage caused her to be "zombie-like." AR 93. She testified she had very little hearing in her right ear. However, she could hear everyone at the hearing "okay" and she became "a real good lip reader." AR 94. She further elaborated that she could hear "fine" in a typical office environment. *Id*.

The ALJ then questioned VE Paprocki. He discussed Shirley's previous work as a phlebotomist, CNA, and management trainee. VE Paprocki was presented with various hypotheticals and ultimately testified that Shirley could perform representative work as an office helper, merchandise marker, and routing clerk.

### III

In his Decision, the ALJ determined that Shirley had the following severe impairments: "status post motor vehicle accident, post traumatic right frontal subdural hemorrhage, and subarachnoid hemorrhage; right knee pain, episodic dizziness, loss of hearing in right ear, depression, anxiety, headaches[.]" AR 17-18. He explained that Shirley's rib pain was a symptom, not an impairment and the medical evidence did not reveal any other rib condition during the period at issue. At Step Three, the ALJ found Shirley had mild limitation in interacting with others. It was only mild where she went to public places such as stores, church, medical facilities, the gym, restaurants, and NBA games, and she had no problems getting along with family, friends, neighbors, or others. AR 19. Shirley had moderate limitation with regard to concentration, persistence, or maintenance of pace. The record evidence provided Shirley's immediate recall "seemed slightly impaired" and her concentration was mildly impaired. *Id*. She had only mild

limitation in adapting or managing oneself. The ALJ also concluded that, "The record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life." AR 20. The ALJ made the following residual functional capacity (RFC) finding:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that is [sic] can frequently climb ramps and stairs, occasionally balance, stoop, kneel, crouch and crawl, should never be at unprotected heights or around moving mechanical parts or vibration, never climb ladders, ropes, and scaffolds. The undersigned concludes that, due to hearing loss the claimant must not be in a loud working environment, but moderate noise as in an office environment is acceptable. Can perform only simple routine and repetitive tasks.

AR 20. In making that find, the ALJ detailed Shirley's May 31, 2014 motor vehicle accident (the alleged disability onset date) and the injuries it caused per a CT scan: posttraumatic right frontal subdural hemorrhage; subarachnoid hemorrhage; and possible basal frontal and temporal lobe hemorrhagic contusions. Shirley underwent a right frontotemporoparietal craniotomy for evacuation of subdural hematoma and a decompressive craniectomy. Shirley was hospitalized again from July 15, to July 17, 2014 and underwent right cranioplasty (replacement of the bone flap). At the time of her discharge, she was alert and oriented, had full strength in all four extremities, was able to ambulate independently, and was given a lifting restriction. She was told to take 500 milligrams of acetaminophen as needed for pain and was also prescribed hydrocodone-acetaminophen for pain.

Throughout his Decision, the ALJ noted Shirley's medications and the complained-of side effects. In August 2014 she did not report any side effects from Norco. At that time, the medical provider told her to decrease Norco use and to transition to ibuprofen or Tylenol. In April 2015, Shirley reported she used Norco

to treat her headaches. That April, she had just become engaged to be married and was thinking about having a baby in the next several months. In November 2015, when she presented for an evaluation of dizziness, Shirley was taking acetaminophen, hydrocodone-acetaminophen, ibuprofen, and propranolol.[2] She did not report any side effects from her medications. In March 2016, Shirley did not report any side effects from her medications. In August 2016 at a Neurology Headache Clinic, Shirley's ibuprofen was stopped and she was started on 500 milligrams of Aleve that was to be taken with her promethazine.[3] She took doxepin[4] at that time which caused her to have vivid dreams at night, but she did not report any other side effects from any of her medications. AR 23.

The ALJ detailed the medical records dated from the time of Shirley's motorcycle accident to February 2017 pertaining to Shirley's complained of impairments. The ALJ also indicated the results of an August 2014 x-ray of Shirley's right knee (normal), May 2015 MRI results (no acute intracranial abnormality), and September 2015 x-rays of Shirley's skull (positive for postoperative changes consistent with her surgeries, but otherwise unremarkable).

---

[2] Propranolol: "a nonselective beta-adrenergic blocking agent that lacks intrinsic sympathomimetic activity, decreases cardiac rate and output, reduces blood pressure, and is effective in the prophylaxis of migraine. DORLAND'S ONLINE DICTIONARY, *available at*
https://www.dorlands.com/dorlands/def.jsp?id=100087092 (last visited Jan. 28, 2019).
[3] "Promethazine is used to relieve or prevent the symptoms of hay fever, allergic conjunctivitis (inflammation of the eye), and other types of allergy or allergic reactions. It works by preventing the effects of a substance called histamine, which is produced by the body. Histamine can cause itching, sneezing, runny nose, and watery eyes. It can sometimes close up the bronchial tubes (air passages of the lungs) and make breathing difficult.
Promethazine is also used to prevent and control motion sickness, nausea, vomiting, and dizziness. In addition, it may be used to help people go to sleep and control their pain or anxiety before or after surgery or other procedures.
Promethazine may also be used for other conditions as determined by your doctor." MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/promethazine-oral-route/description/drg-20070609 (last visited Jan. 28, 2019).
[4] Doxepin hydrochloride: "a tricyclic antidepressant of the dibenzoxepine class, also having significant anxiolytic activity. It is administered orally to treat depression, chronic pain, peptic ulcer, pruritus, and idiopathic cold urticaria, and is used topically to treat pruritus." DORLAND'S ONLINE DICTIONARY, *available at* https://www.dorlands.com/dorlands/def.jsp?id=100032289 (last visited Jan. 28, 2019).

6

Following a couple months of physical therapy in the fall of 2014, Shirley reported: only a little difficulty with housework; denied any difficulty with her usual hobbies, recreational or sporting activities; only a little difficulty performing heavy activities around the house; no difficulty with bending or stooping; no difficulty with ascending and descending two flights of stairs; and she could walk several blocks, participate in recreation, and lift or carry groceries with no limitation. AR 22. At the time Shirley complained of intermittent episodes of vertigo in April 2015, she denied numbness, weakness, vision problems, and changes in gait or speech. When she complained of episodic dizziness in May 2015, Shirley's examinations were all within normal limits and her symptoms could not be reproduced during examination. Her neurological examination was normal in November 2015 as well. Her examination results were all normal when she visited the doctor with complaints of mood disorder in September 2016. During a follow-up for bipolar disorder in January 2017, Shirley's examination results were normal. The ALJ noted that despite Shirley's headaches and vertigo, she denied a history of falls and her dizziness and nausea were "tolerable." AR 24.

## IV

Shirley argues: 1) the ALJ ignored significant evidence favoring her claim in the form of her testimony that is supported by the medical record of her physicians; 2) the ALJ failed to consider her ability to sustain work on a regular and continuing basis; and 3) the report of vocational expert David Patsavas should be considered and confirms Shirley's disability.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).

Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566[5]. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

> 1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

---

[5] The standards for establishing a disability in order to receive DIB and SSI are materially the same. *Compare* 20 C.F.R. § 404.1501 *et seq.* (DIB) *with* 20 C.F.R. § 416.901 *et seq.* (SSI). Thus, the Court may at times only cite to the DIB regulations.

2)  suffers from an impairment that is severe or whether a combination of her impairments is severe;

3)  suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)  is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)  is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Shirley claims error on the ALJ's part at Step Four.

**A**

The Court begins, as the Commissioner does, with Shirley's argument that VE David Patsavas' report should be considered and confirms Shirley's disability. VE Patsavas' report is dated January 30, 2018, two months after the AC denied Shirley's request for review of her disability claims and more than eight months after the ALJ found her not disabled. Patsavas was referred Shirley's file "for the purpose of providing a Vocational Expert opinion as to [Shirley's] level of

employability based on her injury suffered in an accident on May 31, 2014." Plf's Compl. (Doc. 1-3 at pg. 1). Patsavas interviewed Shirley for purposes of the report on December 11, 2017.

The report sets forth the records Patsavas reviewed, a summary of his interview with Shirley, Shirley's then-current medical status, her education, her vocational history, the Social Security determination, and Patsavas' opinions. He opined "[b]ased on all of the materials forwarded and reviewed" by him and his direct interview with Shirley that:

- Shirley suffered a loss of trade and could no longer perform her prior job duties as a CNA as well as a Developmentally Disabled Aide
- Lacked transferable skills into other categories of work based on not only her physical limitations but her cognitive limitations based on diagnosis of PTSD
- A viable and stable labor market did not exist for Shirley.

Plf's Compl. (Doc. 1-3 at pg. 13). Shirley accordingly points out that Patsavas' opinions are contrary to VE Paprocki's. She argues Patsavas' research shows that only one to three jobs listed in each one of those categories identified during the April 2017 hearing as jobs Shirley could perform were available throughout the entire state of Illinois in January 2018. Shirley contends Patsavas' report should be considered by the Court or the matter remanded so the report may be considered by the SSA. The Commissioner counters that Shirley has not met her burden to prove the elements of a Sentence Six remand.

"To merit a remand pursuant to the sixth sentence of 42 U.S.C. § 405(g), a claimant must show that 'there is new evidence which is material and that there is good cause for failure to incorporate such evidence into the record in a prior proceeding.'" *Jens v. Barnhart*, 347 F.3d 209, 214 (7th Cir. 2003). "New" evidence means evidence not in existence or available to the claimant at the time of the

10

administrative proceeding. *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). New evidence is "material" if there is a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered. *Id*. As for "good cause," the Commissioner cites to *Anderson v. Bowen*, in which the Seventh Circuit Court of Appeals determined good cause is *not* demonstrated where "the reasons for pursuing additional evidence are apparent while the case is still subject to administrative review, and there is no impediment to obtaining the evidence[.]" 868 F.2d 921, 928 (7th Cir. 1989).

Here, the Commissioner does not concede Patsavas' report is "new." However, even assuming that is correct, Shirley cannot establish the remaining two elements – that the report was material or that there was good cause for her failure to timely incorporate it into the record. In her Motion for Summary Judgment, Shirley merely contends that Patsavas reached a different conclusion – that she is disabled – from the ALJ's conclusion. Shirley does not articulate how the ALJ's consideration of Patsavas' report would have led the former to a different conclusion, and she certainly does not establish there is a reasonable probability the ALJ would have reached a conclusion in her favor upon his consideration of the report. Patsavas' report simply provides a different opinion about the evidence of record. The ALJ was tasked with considering the opinions in evidence at the time he made his Decision, and he determined the evidence did not support an opinion that Shirley was disabled.

Shirley also fails to argue good cause for her delay in obtaining Patsavas' report. The Court can discern no impediment that prevented Shirley from obtaining the report earlier, and the only "apparent" reason for pursuing the report was that Shirley's claims were denied. Of course, such a reason cannot be recognized as the "good cause" necessary to warrant a Sentence Six remand. If it were, after-the-fact VE reports could come in as a matter of course and would turn

11

the administrative review process on its head. As the Commissioner points out, Patsavas reviewed records that were all in existence by March 2017, or before the April 2017 hearing. Shirley is not entitled to a Sentence Six remand based upon Patsavas' January 30, 2018 report.

B

Shirley also argues that the ALJ erred in several respects when he rejected the majority of the medical treatment notes, rejected Shirley's testimony, "picked and chose" among the evidence, and failed to appreciate the difference between Shirley being able to occasionally sustain work activity and her ability to sustain work activity on a regular and continuing basis. The Commissioner counters that the ALJ reasonably weighed Shirley's description of her functioning where her admitted abilities and activities conflicted with her described limitations, the ALJ catalogued the normal findings on virtually all physicals, the clinical evidence showed at most mild abnormalities which contradicted Shirley's account of extreme limitations, there were uncontested conflicts between the medical opinion evidence and Shirley's testimony, the ALJ did not ignore evidence that conflicted with his findings, and Shirley identifies no evidence of limitations aside from her testimony.

An ALJ need not mention every piece of evidence as long as he builds a logical bridge from the evidence to his conclusion. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Stated another way, an ALJ must "sufficiently articulate his assessment of the evidence to assure [the court] that the ALJ considered the important evidence . . . and to enable [the court] to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). An ALJ "may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). While the court reviews the record as a whole, it will not reweigh the evidence or substitute its judgment for that of the ALJ. *Id*. at 475.

**1**

SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016), *citing* SSR 16-3p, 81 Fed. Reg. 14166 (Mar. 16, 2016). SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) are to be considered including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional imitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8. SSR 16-3p reminds those considering it that, "Subjective symptom evaluation is not an examination of an individual's character." *Id.* at *2.

In his Decision, the ALJ properly considered Shirley's testimony regarding the intensity, persistence, and limiting effects of her symptoms. The ALJ did not engage in an examination of Shirley's character. Rather, the ALJ considered the relevant factors. The ALJ described Shirley's daily activities: she had no problem with personal care; she performed household chores including cooking, cleaning, and laundry; she took her son to and from school every day; she went shopping and to church on a regular basis; and she went to the gym three times per week. The ALJ detailed the medical records pertaining to Shirley's complaints of headaches, the medications she took to treat those headaches, and the medical tests she underwent because of them.

As with his consideration of Shirley's headaches, the ALJ detailed her vertigo complaints, the medical tests she underwent to treat the vertigo, and the

normal examination results at the times she complained about it. In May 2015, the Illinois Neurological Institute Vertigo Clinic reported it was unable to reproduce Shirley's symptoms of vertigo. In September 2015, Shirley reported her dizziness and nausea were "tolerable." AR 24. In November 2015, during an evaluation for dizziness, Shirley reported she took acetaminophen, hydrocodone-acetaminophen, ibuprofen, and propranolol. She reported no side effects from those medications. A December 2015 treatment record provided that a neurologist noted Shirley's right to left positional vertigo did not need follow-up where "things were mainly benign." AR 842. In August 2016, Shirley reported that the doxepin she was taking caused her to have vivid dreams at night, but she did not otherwise report any side effects from any of her medications. At that time, Shirley also reported headaches she rated at a 10 on a pain scale, she took Tylenol or ibuprofen "only four to five times a week," and she had not taken Norco in "about a month." AR 24.

The ALJ noted Shirley's complaints of low back and knee pain, and the ALJ identified instances in the record where Shirley reported no difficulty with certain movements including climbing and descending two flights of stairs and walking several blocks. He recited the imaging results of Shirley's right knee radiographic imaging (no abnormality), the fact that Shirley occasionally wore a knee brace, and the fact that she had pursued "little treatment" for knee problems. AR 24. The ALJ acknowledged Shirley took narcotic pain medication, but also stated that there had been "periods since the alleged onset date during which [Shirley] was not taking any narcotic pain medication . . . [Shirley] does not use any assistive devices, such as canes, crutches, or hearing aids[.]" *Id.*

As the foregoing illustrates, the ALJ considered Shirley's daily activities, the location of her pain symptoms, her medications and their side effects, and other measures she used to relieve her pain. He noted, "Despite the degree of symptoms

14

alleged, [one doctor] reported that [Shirley] appeared younger than her stated age" in April 2016. AR 25; AR 864. The ALJ sufficiently articulated his assessment of the record evidence that was relevant to the question of the intensity, persistence, and limiting effects of Shirley's symptoms, and so it is clear the ALJ satisfied his duty under the relevant regulations and Social Security Ruling. *See Carlson*, 999 F.2d at 181. No reversible error was committed in this regard.

**2**

A claimant's RFC "is the most he can still do despite his limitations." 20 C.F.R. § 404.1545(a). An RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p; *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record"). Here, Shirley argues that her own testimony is supported by and consistent with her medical records and altogether they reflect a proper basis for granting her the requested disability benefits. She disputes that the ALJ properly weighed the effects of her medication and/or properly rejected her testimony concerning the side effects of her medication.

It is apparent, as set forth *infra*, that the ALJ adequately analyzed the entirety of the record evidence, specifically Shirley's testimony and medical records. He properly compared that evidence to determine Shirley's RFC. He included a narrative discussion which described how the evidence supported his conclusions (to reject the testified-to extent of Shirley's limitations, to afford weight to some opinions and not others to the extent supported by the medical and other evidence, etc.) and he cited particular medical facts and nonmedical evidence alike. SSR 96-8p. By doing so, the ALJ made clear that he credited Shirley's reports to treatment

providers, rather than her hearing testimony, about her medication side effects as more fully consistent with and supported by the entirety of the evidence.

In finding Shirley moderately limited in concentrating, persisting, or maintaining pace at Step Three, the ALJ referred to Shirley's ability to complete her own disability forms, cook and prepare meals, read two to three times a week, drive without difficulty, and could pay attention for 30 minutes to an hour. In finding Shirley only mildly limited in adapting or managing oneself, the ALJ referred to Shirley's ability to care for herself, perform household chores, take care of her son, go outside almost every day, and travel to Belize for seven days around March 2016. Later in his Decision, the ALJ stated, "In sum, the claimant did experience significant injuries in the motor vehicle accident; however, the objective medical evidence indicates that she generally recovered well and that the remaining residuals do not support a finding of disability." AR 23.

With regard to her alleged hearing loss, the ALJ noted audiological testing showed that Shirley's ear problem resolved but, "[r]egardless, the undersigned finds that the claimant must not be in a loud working environment, but moderate noise as in an office environment is acceptable." AR 24. As for her vertigo and headaches, the ALJ noted that despite her headache pain at an intensity of 10 and dizziness which prevented her from doing yard work, Shirley drove on a regular basis and testified to no problems driving. The ALJ limited Shirley to "never be at unprotected heights or around moving mechanical parts or vibration because of her dizziness and headaches." *Id*.

The ALJ did not merely explain that he limited Shirley to "a limited range of light work, which takes into consideration her subjective complaints of pain." *Id*. After he summarized Shirley's mental health records, the ALJ explained he limited her to simple routine and repetitive tasks because of her mental impairments. He explained, "The claimant's daily activities are not consistent

16

with the degree of symptoms and functional limitations alleged. Her daily activities are discussed under the "B" criteria [at Step Three]." AR 25. The ALJ proceeded to recite Shirley's hearing testimony as support for his conclusion. Upon turning to the opinion evidence, the ALJ first discussed Shirley's employer's June 4, 2014 letter to her which stated she would be eligible for rehire once her doctor had released her without any restrictions. Shirley was released to return to work, "from a neurosurgical standpoint," effective September 8, 2014. *Id.*; AR 559.

The ALJ then explained that based upon new and material evidence, he added additional limitations beyond those provided by the State Agency examiners who determined Shirley could perform a limited range of light work. The ALJ determined the consultative examiner's opinion was entitled to weight where "the objective medical evidence is consistent with mild to moderate mental symptoms and limitations." AR 25. The ALJ did not afford weight to Shirley's primary care physician's opinion (that Shirley was unable to work) because the doctor "did not set forth any specific work related limitations" and the objective medical evidence did not support his opinion. AR 25-26. Finally, the ALJ rejected a February 8, 2017 medical source statement due to its inconsistency with the record evidence.

In her Motion for Summary Judgment, Shirley does not specifically point to any evidence the ALJ allegedly failed to cite which would compel a "disabled" finding. The ALJ included *both* the evidence of record supportive of a disability finding and the evidence supportive of a contrary finding; the ALJ ultimately determined the evidence more fully supported a "not disabled" finding. Shirley has not convincingly shown the ALJ failed to appreciate the difference between Shirley's ability to occasionally sustain work activity and to regularly and continually do so. She seems to argue that the ALJ failed to appreciate the difference simply because he cited her daily activities as indicative of lesser

17

limitations than alleged. As discussed supra, the ALJ was tasked with considering Shirley's daily activities at various points throughout the five-step disability analysis. Also, the ALJ discussed Shirley's medication side effects (and the lack thereof reported to her doctors). Whether someone else would weigh the foregoing evidence differently is not the question before the Court. The Court may not reweigh the evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The Court must only determine whether substantial evidence supports the ALJ's Decision and whether the proper legal standards were applied. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The Court answers both questions in the affirmative. Neither remand with an award of benefits nor a remand for rehearing is warranted in this case.

V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 10) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 14) be granted; 3) judgment be entered in favor of the Defendant, Commissioner of Social Security, and against the Plaintiff, Shirley R.; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on January 29, 2019.

s/Jonathan E. Hawley<br>U.S. MAGISTRATE JUDGE